122 P.3d 908 (2005)
155 Wash.2d 817
STATE of Washington, Respondent,
v.
Joshua M. WINGATE, Petitioner.
No. 76325-9.
Supreme Court of Washington.
Considered January 25, 2002.
Decided November 10, 2005.
*909 Ms. Kathleen Proctor, Pierce County Prosecutor's Office, Tacoma, for Petitioner/Appellant.
Ms. Suzanne Lee Elliott, Attorney at Law, Seattle, for Appellee/Respondent.
PER CURIAM.
¶ 1 The State seeks review of a published Court of Appeals decision reversing Joshua Wingate's first and second degree assault convictions. The State argues that the trial court correctly gave a first aggressor instruction and that the Court of Appeals erred in holding otherwise. We agree, grant review on this issue only, and reverse.

FACTS
¶ 2 On June 21, 2001, Stephen Park discovered that his friend, James Koo, was dating Park's former girl friend, Elizabeth Kim. Park called Koo and told him he was coming to Koo's house to confront him about his involvement with Kim. Three of Park's friends, Joseph Feist, Chad Scott, and Marco Poydras, followed Park to Koo's house.
¶ 3 Word circulated among Koo's friends that Park was on his way to confront Koo. Approximately 10 to 15 of Koo's friends gathered at Koo's house, including Wingate, who brought along his handgun.
¶ 4 When Park and his friends arrived, they parked their vehicles across the street from Koo's house. The State and the defense presented two very different versions of what transpired after Park's arrival.
¶ 5 Wingate testified that Park pulled a sawed-off shotgun from the trunk of a car driven by Park's friend, pumped (cocked) the gun, and put it back into the trunk, leaving the trunk lid open. Another witness testified that Park seemed to put something in the back of his waistband. Park then crossed the street to Koo's house. Koo came out but would not stand and face Park, so Park began to chase Koo around a truck parked in Koo's driveway.
¶ 6 Wingate testified that while Park was chasing Koo, Wingate observed Feist, Scott, and Poydras standing by the open trunk. Wingate thought the three men were guarding the open trunk with the sawed-off shotgun inside. Wingate testified that he believed that Park was getting out of control. Wingate approached the three men by the open trunk, pulled out his gun to scare them so he could retrieve the shotgun and told them to move away from the car. After the trio obliged, Wingate removed the shotgun from the trunk.
¶ 7 While this was happening, Koo went back inside his house. Park then noticed Wingate pointing a gun at his three friends across the street, went over to the car, and challenged Wingate. Feist pulled a handgun from his waistband. Wingate threatened to shoot if Feist did not drop the gun; Feist put his gun in the still-open trunk, and Wingate's friend took the shotgun that Wingate had been holding. Wingate pointed his gun at Park's chest and told Park that Koo did not want to fight. Park retorted that the matter was none of Wingate's business.
¶ 8 Park was standing between Wingate and Park's three companions. Park allegedly took a step toward Wingate, taunting, "Are you going to shoot me?" Report of Proceedings (RP) at 522. Wingate testified that although he saw no gun, he thought Park was reaching for one. Wingate lowered his gun away from Park's chest and shot Park in the leg. Park, however, was not armed. According to Wingate, he was trying to prevent a shooting by removing the shotgun, but Park's friend had just put another gun in the open trunk, Wingate did not know who else might be armed, and the four men outnumbered Wingate, leaving Wingate few options.
¶ 9 In the State's version of events, there were two incidents that day at Koo's house. Park testified that he did not touch any shotgun that day. Park arrived and attempted to confront Koo, but Koo would not stand still and confront Park. Koo went back inside his house, ending the first incident. Park then saw that Wingate had pulled a gun on Park's friends across the street, and Park approached Wingate to resolve that matter. *910 Park testified he did so because he knew Wingate, but the other three men did not. Park testified that he stood between Wingate and the three men by the car, raised his hands, palms up, to shoulder level, and said, "What are you going to do? You going to shoot me?" RP at 28. Wingate then shot Park and said, "Who else wants some?" RP at 29.
¶ 10 After the shooting, everyone scattered and left in the various cars present. Park was eventually treated at a hospital for his gunshot wound. The State ultimately charged Wingate with one count of first degree assault, for shooting Park in the leg, and three counts of second degree assault, for pointing his gun at Park's three companions, with firearm enhancements for all counts.
¶ 11 At trial, the State proposed a first aggressor instruction, which the trial court permitted over defense counsel's objection. The jury convicted Wingate on all counts except count two, the alleged assault against Poydras. The jury returned a special verdict on the three convictions, finding that Wingate was armed with a firearm at the time of the assaults. The trial court ultimately imposed a sentence below the standard range.
¶ 12 The State appealed the exceptional sentence. Wingate cross-appealed his conviction, asserting in part that the trial court erred in giving a first aggressor instruction. The Court of Appeals reversed, holding that the facts did not warrant a first aggressor instruction. As discussed below, that holding is incorrect.

ANALYSIS
¶ 13 The trial court gave the following first aggressor instruction:
No person may, by any intentional act reasonably likely to provoke a belligerent response, create a necessity for acting in self defense or defense o[f] another and thereupon use, offer or attempt to use force upon or toward another person. Therefore, if you find beyond a reasonable doubt that the defendant was the aggressor, and that defendant's acts and conduct provoked or commenced the fight, then self-defense or defense of another is not available as a defense.
Clerk's Papers at 24(CP) (instruction 16). This instruction essentially reflects 11 Washington Pattern Jury Instructions: Criminal 16.04, at 182 (2d ed.1994), which we approved in State v. Riley, 137 Wash.2d 904, 908-09, 976 P.2d 624 (1999). The instruction properly directs the jury to determine whether the defendant's acts precipitated a confrontation with the victim. Riley, 137 Wash.2d at 914, 976 P.2d 624.
¶ 14 The Court of Appeals acknowledged Riley but opined that "[a] first-aggressor instruction is proper when the record shows that the defendant is involved in wrongful or unlawful conduct before the charged assault occurred." See State v. Wingate, 123 Wash.App. 415, 422-23, 98 P.3d 111 (2004) (citing State v. Brower, 43 Wash.App. 893, 721 P.2d 12 (1986)). "The record before us does not show that Wingate was involved in any wrongful or unlawful conduct when he pointed his gun at Park in an attempt to keep Park from harming Koo." Id. at 423, 98 P.3d 111 (citing State v. Craig, 82 Wash.2d 777, 783, 514 P.2d 151 (1973)).
¶ 15 The Court of Appeals' reliance on Brower and Craig is misplaced. Brower dealt with an aggressor instruction that addressed an "unlawful act" that created a necessity to respond in self-defense, rather than an intentional act that is reasonably likely to provoke a belligerent response, as does the present instruction. See Brower, 43 Wash.App. at 901, 721 P.2d 12. The "unlawful act" language appearing in the aggressor instruction in Brower was previously held to be unconstitutionally vague. See id. (referencing State v. Arthur, 42 Wash.App. 120, 708 P.2d 1230 (1985), which found the "unlawful act" language improper). Brower's analysis is not appropriate here.
¶ 16 In Craig, a defendant who stabbed and killed a cab driver during a robbery sought a self-defense instruction because the cab driver attempted to hit the defendant with a lug wrench in the course of the robbery. We upheld the trial court's denial of a self-defense instruction because the defendant's conduct had given the victim good cause to believe that he was threatened *911 with bodily harm, and the defendant had not abandoned his threatening behavior. See Craig, 82 Wash.2d at 783-84, 514 P.2d 151. Craig holds that one who provoked the altercation cannot invoke the right of self-defense. Id. at 783, 514 P.2d 151; see also Riley, 137 Wash.2d at 909, 976 P.2d 624. That notion is consistent with the language of the first aggressor instruction given here. See CP at 24 (last sentence of instruction 16, quoted above). Thus, the Court of Appeals' reliance upon Craig as supporting reversal is also misplaced.
¶ 17 The Court of Appeals' view  that Wingate was pointing his gun at Park in an attempt to keep Park from harming Koo  is factually questionable because it is undisputed that Koo was in his house and not present during the confrontation between Wingate and Park. But more importantly, the Court of Appeals' approach is contrary to the directive of Riley that "[a]n aggressor instruction is appropriate if there is conflicting evidence as to whether the defendant's conduct precipitated a fight." Riley, 137 Wash.2d at 910, 976 P.2d 624 (emphasis added) (citing State v. Davis, 119 Wash.2d 657, 666, 835 P.2d 1039 (1992)). Here, there is conflicting evidence about whether Park displayed a shotgun and returned it to the car trunk before he confronted Koo. It is undisputed, however, that Park never struck Koo, and that after a brief encounter with Park, Koo went back into his house. Thus, one reasonable interpretation of the evidence is that a nonviolent confrontation between Park and Koo had terminated when Park attempted to intervene in Wingate's confrontation with Park's companions.[1]
¶ 18 It is also undisputed that Wingate was the only person to draw a gun and aim it at another person. In Riley there was similar evidence that the defendant drew his gun first and aimed it at someone that he later shot. The defendant in Riley also asserted that he drew his gun in order to secure a weapon that he believed the shooting victim had concealed. See Riley, 137 Wash.2d at 906-07, 976 P.2d 624. We held that in light of the presence of evidence of the defendant's "aggressive conduct"  that is, the defendant drawing his gun first and aiming it at another person  the giving of an aggressor instruction was proper. See Riley, 137 Wash.2d at 909-10, 976 P.2d 624. The same is true here.

CONCLUSION
¶ 19 Consistent with Riley, the trial court properly gave the first aggressor instruction in light of the conflicting evidence regarding who precipitated the confrontation between Wingate, Park, and Park's companions. The Court of Appeals erred by holding otherwise. Accordingly, we reverse the Court of Appeals decision and remand to that court for further proceedings consistent with this opinion. We direct the Court of Appeals to address the issues raised by Wingate that it failed to reach in its first decision.[2] RAP 13.7(b).
NOTES
[1] In giving the first aggressor instruction, the trial court ruled that the evidence is at least susceptible of the reasonable interpretation that the confrontation between Koo and Park had concluded and that Wingate might have been the aggressor as to Park and his three companions. See RP at 564-65. Thus, under Riley, the trial court correctly concluded that the aggressor instruction was warranted. See also State v. Fernandez-Medina, 141 Wash.2d 448, 455-56, 6 P.3d 1150 (2000) (when determining if the evidence at trial was sufficient to support the giving of an instruction, the appellate court is to view the supporting evidence in the light most favorable to the party that requested the instruction).
[2] Because the Court of Appeals reversed and remanded for a new trial, it did not address Wingate's contentions that he received ineffective assistance, that there was insufficient evidence to support his convictions, and that the prosecutor committed misconduct by arguing facts outside the record during closing argument.